IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2788

_____

ADA ANGLEMEYER; RICHARD C. ANGLEMEYER; JEFFREY
ANGLEMEYER; JOSEPH KLUSKA,

Appellants

v.

CRAIG AMMONS; BRIAN ATKINSON; NATHAN AUKAMP; MARK A.
BENSON; DAVID BRODEUR; JOHN P. CHULOCK; PETER DEL GAIZO;
BRIAN L. KING; MICHAEL D. LANG; VINCENTE LOPEZ; ROBERT W.
McGARVEY; TERRANE W. MERANTE; CLINTON C. PAINTER; JASON
PELOTTE; MATTHEW J. PIEROTTI; LANCE SCHIMP; EVIN WARD;
DANIEL WILK; MATTHEW WYSOCKY; JOHN DOE

_____

BRIEF FOR APPELLEES

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
ENTERED SEPTEMBER 13, 2022

Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
Phone: (215) 560-2908
FAX:  (717) 772-4526

DATE:  March 27, 2023

MICHELLE A. HENRY
*Attorney General*

BY:  CLAUDIA M. TESORO
*Senior Deputy Attorney General*

J. BART DeLONE
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF ISSUES ....................................................................... 2

STATEMENT OF THE CASE .................................................................... 3

    Facts relevant to the issues submitted for review. ............................. 3

    Procedural history. .......................................................................... 15

    Rulings presented for review. .......................................................... 17

STATEMENT OF RELATED CASES ........................................................ 20

SUMMARY OF ARGUMENT .................................................................. 21

ARGUMENT ........................................................................................... 22

I.    As A Matter Of Law, The Defendants Were Entitled To Summary Judgment On The Merits Of Jeffrey's and Richard's Fourth Amendment Claims. .................................................................... 23

    A.    The search of the property was planned in detail and carried out accordingly. ...................................................... 24

    B.    Governing Fourth Amendment principles are well-established. ........ 25

    C.    Neither Jeffrey nor Richard could show that he suffered a Fourth Amendment violation. .......................................... 28

II.    The Defendants Were Entitled To Qualified Immunity On All Of The Plaintiffs' Fourth Amendment Claims Against Them. ................................. 30

CONCLUSION ....................................................................................... 34

CERTIFICATE OF COUNSEL ................................................................ 35

CERTIFICATE OF SERVICE .................................................................. 36

# TABLE OF AUTHORITIES

Page

## Cases

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011) .................................................................................. 32, 33

*Bailey v. United States*,
   568 U.S. 186 (2013) ........................................................................................25

*Baker v. Monroe Twp.*,
   50 F.3d 1186 (3d Cir. 1995) ...........................................................................25

*Carroll v. Carman*,
   574 U.S. 13 (2014) ..........................................................................................32

*Ghana v. Holland*,
   226 F.3d 175 (3d Cir. 2000) ...........................................................................23

*Graham v. Connor*,
   490 U.S. 386 (1989) ........................................................ 25, 26, 26, 29, 30, 33

*Hunter v. Bryant*,
   502 U.S. 224 (1991) ........................................................................................31

*Johnson v. Glick*,
   481 F.2d 1028 (2d Cir. 1973) ......................................................................... 27

*Jones v. Southeastern Pa. Transp. Auth.*,
   796 F.3d 323 (3d Cir. 2015) ...........................................................................22

*Jutrowski v. Township of Riverdale*,
   904 F.3d 280 (3d Cir. 2018) ..................................................................... 21, 29

*Karns v. Shanahan*,
   879 F.3d 504 (3d Cir. 2018) ...........................................................................22

*Kost v. Kozakiewicz*,
   1 F.3d 176 (3d Cir. 1993) ...............................................................................23

*Malley v. Briggs*,
   475 U.S. 335 (1986) ........................................................................................31

*Mammaro v. New Jersey Division of Child Protection and Permanency,*
814 F.3d 164 (3d Cir. 2016)...................................................................32

*Maryland v. Garrison*,
480 U.S. 79 (1987)...............................................................................33

*Michigan v. Summers*,
452 U.S. 692 (1981)...................................................................... 25, 33

*Mullenix v. Luna*,
577 U.S. 7 (2015).................................................................................31

*Reichele v. Howards*,
566 U.S. 658 (2012).............................................................................30

*Rivas v. City of Passaic*,
365 F.3d 181 (3d Cir. 2004)........................................................ 26, 27, 30

*Rivera v. Monko*,
37 F.4th 909 (3d Cir. 2022) .................................................................30

*Saucier v. Katz*,
533 U.S. 194 (2001)...................................................................... 31, 32

*Taylor v. Barkes*,
575 U.S. 822 (2015).............................................................................30

*United States v. Arvizu*,
534 U.S. 266 (2002).............................................................................27

*Werkheiser v. Pocono Twp.*,
780 F.3d 172 (3d Cir. 2015).................................................................31

*Williams v. City of York*,
967 F.3d 252 (3d Cir. 2020).................................................................29

*Zaloga v. Borough of Moosic*,
841 F.3d 170 (3d Cir. 2016).................................................................31

## Statutes

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1343 ...................................................................................1

42 U.S.C. § 1983 ........................................................................ 1, 17, 29

## Constitutional provisions

U.S. CONST. amend. IV .................................................................. *passim*

## Rules

Fed.R.App.P. 30(a)(2) ............................................................................4

## STATEMENT OF JURISDICTION

This is a civil rights action, brought pursuant to 42 U.S.C. § 1983.  The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

This appeal is from a final order, entered on September 13, 2022 (Appx. I, at 3).  The notice of appeal was filed on September 23, 2022 (Appx. I, at 1-2).  This Court has appellate jurisdiction by virtue of 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

*In connection with an ongoing investigation into drug-related offenses allegedly being committed on a 60-acre property in Northampton County, local police sought assistance from the Pennsylvania State Police ("PSP"). Thus, PSP officers participated in the execution of a search warrant on that property, where numerous related individuals lived. Four of those people later brought excessive force claims against a total of 19 named PSP officers and certain other parties. The PSP defendants prevailed on summary judgment. At this stage, only the plaintiffs' claims against six of the original PSP defendants remain at issue. As to them, the questions presented are:*

I.      Based on the undisputed and indisputable facts of record, was any use of force by the PSP defendants in their encounters with two of the plaintiffs reasonable under all the circumstances and therefore acceptable as a matter of Fourth Amendment law?

II.      In any event, were the PSP defendants entitled to qualified immunity on all of the plaintiffs' claims because, under the unique circumstances presented, their actions during the operation at issue, vis-à-vis each individual plaintiff, were not contrary to clearly established Fourth Amendment precedents?

# STATEMENT OF THE CASE

This appeal challenges certain events that occurred in connection with a complicated law enforcement operation that was planned and carried out by local police, with Pennsylvania State Police assistance. In this Court, the four plaintiffs (now appellants) focus on six PSP officers who participated, with many others, in that complex operation.

## Facts relevant to the issues submitted for review.

Both sides agree on virtually all of the essential facts giving rise to this controversy. These were duly set forth by the defendants in connection with their district court dispositive motion, in 148 paragraphs (*see* ECF No. 49-2), and explicitly accepted by the plaintiffs, essentially *in toto* (*see* ECF No. 51, at 31).[1]

_____

[1] In this brief, record citations for the defendants' factual assertions in support of their motion for summary judgment, and the plaintiffs' corresponding responses admitting those assertions, will be by paragraph numbers alone. In their response to the defendants' motion, plaintiffs did add a limited number of additional facts, purportedly in dispute and set forth as ¶¶ 149-157 (*See* ECF No. 51, at 32-38). Defendants duly responded to those further assertions, admitting a number of them (*See* ECF No. 52-1). Here, as necessary, those additional undisputed details in the parties' final summary judgment filings will also be cited by paragraph number.

It should be noted that each of the factual assertions in the defendants' primary district court submission in support of their dispositive motion was supported by citations to deposition transcripts and other pertinent evidence, all of which was provided to the court along with the defense motion itself. Although

This litigation concerns the execution of a search warrant at 340 Old Allentown Road, in Bangor Township (Northampton County), Pennsylvania ("the property"), on February 23, 2018. The property, consisting of approximately 60 acres overall, was and is owned by Ada and Richard Anglemeyer, two of the plaintiffs in this case. It includes a large residence and numerous other structures [¶¶ 1-3].

As of February 2018, eight individuals were living in the residence on the property. Aside from Ada and Richard, the owners of record, who were 76 and 77 years old at the time, the residents included three of their adult children: son Mark Anglemeyer (age 52); son Jeffrey Anglemeyer (age 55); and daughter Renae Kluska (age 48).[2] The residents of the property also included Renae's husband, Joseph Kluska (age 44); their daughter, Kierra Kluska (age 17); and Renae's son, Tyler Trinkley (age 20) [¶ 4]. As noted, Ada and Richard are plaintiffs in this case, as are their son, Jeffrey, and their son-in-law, Joseph Kluska.

---

the plaintiffs did not include these underlying materials in their Appendix, they are in the district court record and may be referred to and relied on at this stage, as appropriate. *See* Fed.R.App.P. 30(a)(2).

[2] Hereinafter, to avoid confusion, the three individual plaintiffs with the surname "Anglemeyer" (Ada, Richard, and Jeffrey), as well as non-plaintiff Mark Anglemeyer, will generally be referred to by their respective given names.

The events in question date back to February 8, 2018, when Detective Michael Enstrom of the Northampton County Drug Task Force ("NCDTF") contacted PSP's Special Emergency Task Force ("SERT") regarding the property [¶ 5]. SERT is a State Police unit trained to deal with volatile, high-risk situations [¶ 6]. Detective Enstrom spoke with PSP Sgt. Mark Rowlands and asked for SERT's assistance in serving a search warrant that Detective Enstrom intended to obtain, authorizing a search by NCDTF of the entire property [¶ 7].

Detective Enstrom relayed to Sgt. Rowlands that the warrant he expected to obtain would be based on multiple controlled buys of crystal methamphetamine from one of the residents of the property, Mark Anglemeyer. Detective Enstrom also explained that the planned search of the property would extend to a detached garage or trailer where the referenced drug purchases had been or would be made, as well as the residential structure where Mark lived [¶ 8]. Based on the information relayed to Sgt. Rowlands by Detective Enstrom, the situation qualified for SERT involvement [¶ 9].

Between February 8, the date of their initial conversation, and February 23, 2018, Sgt. Rowlands obtained further information from Detective Enstrom and the NCDTF about the property and its residents [¶ 10]. In addition, Sgt. Rowlands and other PSP staff assigned to SERT independently reviewed criminal histories, firearms registration records, and social media accounts in an effort to gather

further information about the eight adults and one teenager who were believed to live on the property [¶ 11].

On February 22, 2018, as planned, NCDTF obtained a warrant to search the property.  By its terms, the warrant allowed for a search of the residence, the trailer, and the garage, and "[a]ll persons located on the premises described herein" [¶ 12].  No one from SERT had been involved in the process of obtaining the warrant or in the underlying NCDTF investigation that led to the issuance of the warrant, all of which had been handled entirely by county officers [¶ 13].

Meanwhile, on or about February 21, 2018, various SERT members were notified that they were to report to the PSP Belfast Barracks at 4:00 the next morning for a briefing on the planned operation [¶ 14].  Approximately 50 SERT members were activated for this operation, including all 19 PSP defendants against whom plaintiffs later filed suit [¶ 15].  At the briefing, SERT members were provided with a written "intelligence brief" prepared by PSP Corporal Arthur Johnson [¶ 16].  In addition, Sgt. Rowlands and other SERT leaders gave a verbal presentation, which was video-recorded [¶ 17].

By means of the written "intelligence brief," the in-person verbal briefing, or both, considerable information about the property, the residents, and the upcoming search was relayed to all 50 or so SERT members in attendance [*See* ¶¶ 18(a)-18(w)].  In this way, those SERT members were advised that:

- SERT was to execute a high-risk search warrant for the NCDTF, based on multiple methamphetamine sales by Mark Anglemeyer that had occurred in a detached garage on the property.

- Mark, along with seven other adults and a 17-year-old, was believed to live in the residence on the property.

- Pursuant to the search warrant, the planned search of the property would extend to the residence, the garage, and a trailer on the property.

- There were numerous guns on the property.

- The residents were "not law enforcement friendly."

- Gun-purchase records indicated that several of the residents had previously purchased handguns.

- The weapons believed to be inside the residence included an AR-15.

- Videos viewed on Facebook showed some of the residents firing an AR-15 and a 50-caliber rifle on the property.

- The residents were known to openly carry guns on their person while on the property.

- Some resistance, by residents, to the authorized search was expected.

- Mark Anglemeyer had a lengthy criminal record, including charges relating to drug sales, assault, and resisting arrest, and he had been involved in a previous incident where he led police on a dangerous vehicle pursuit.

- Mark's brother, Jeffrey, also had an extensive criminal record (including drug-sale charges; firearms violation charges; and assault, strangulation, and resisting arrest charges).

- Mark's sister, Renae Kluska, had a past charge as well, for simple assault.

- Similarly, Renae's husband, Joseph Kluska, had a past simple assault charge.

- Other family members, who were also expected to be on the property, did not have criminal histories.

- It was unknown whether any of the other residents (aside from Mark) played any role in the drug sales that had occurred on the property.

- A description of the property itself, including photos, was provided to SERT members in the course of the briefing.

- Among the photos shown to the SERT members were some depicting the exteriors of the structures to be entered during the upcoming search.

- According to the confidential informant who had been working with the officers, the property had "an extensive surveillance system."

- The residence to be searched is a split-level style house.

- The interior of the residence was described as "a puzzle," with "a lot of additions."

- No good description of the interior of the residence as a whole had been obtained.

- The anticipated locations of a "pool room" and a "game room" were provided, however.

All of the SERT members were assigned specific tasks related to the search. Basically, all 19 defendants named in this litigation were expected to enter and secure the residence (although the ensuing acts of most of those defendants are no longer at issue in this litigation). Some of them were to go in through an exterior

door on the upper level, while others were to simultaneously enter through a French door on the lower level [¶ 19].

Beyond this general plan, the 19 PSP defendants were *not* given details regarding the specific layout of the interior of the residence. Nor were they told where any of the individuals who were expected to be on the property were likely to be found [¶ 21].

After the verbal briefing, the SERT members assigned to enter the residence put on their uniforms and equipment and, in the parking lot, rehearsed – at least three times – how they would enter the residence. With all wearing olive-colored helmets and the same, standard SERT camouflage uniform, they then proceeded (in several marked vehicles) to the property [¶¶ 22-24].[3]

As they neared their target location, other SERT members conducting surveillance at the property observed a black Chevrolet Suburban leaving the property. This information was shared with approaching SERT members, and the Suburban passed them, going in the opposite direction [¶ 25]. The SERT members reached their destination at about 6:05 AM [¶ 26]. It was still dark [*Id.*].

_____

[3] Plaintiffs suggest that the SERT members had "no name or badge number on their uniforms to intentionally conceal their identities," *see, e.g.,* appellants' brief, at 9, but there is no basis for this malign characterization. Standard SERT uniforms do not display or contain the individual trooper's name or badge number (*See* ¶ 149).

Just as some SERT members approached the lower level entrance of the residence, defendant Jason Pelotte observed an adult male he believed to be Richard Anglemeyer, looking out a window by the entrance. That prompted defendant Pelotte to inform the other SERT members by radio that they had been compromised [¶¶ 28-29].[4] Both entrances to the house were then forcibly entered [¶ 30].

Five of the six PSP defendants who interacted, or allegedly interacted, with the plaintiffs went into the house through the lower level entrance. As to them, the following facts are undisputed:

When defendant *Vincente Lopez* entered the house, he was armed with a crow bar and a handgun (¶¶ 31-32). The parties agree that he had physical contact with one person: a white male in the living room (¶ 33). Officer Lopez applied flex cuffs to that individual (*id.*), apparently without incident.

Defendant *Mark Benson* was armed with a rifle and a handgun when he entered the house (¶¶ 60-61). He encountered a white male who did not comply with commands to get to the ground, so defendant Benson assisted with securing that person (¶ 62). Further, it is undisputed that defendant Benson remained with

---

[4] At this stage, plaintiffs are no longer pursuing any claims against defendant Pelotte.

the person he had secured; he did not[5] have physical contact with any other

resident of the house (¶ 63).

Defendant *Robert McGarvey* entered the lower level of the house holding a

hand gun in one hand and carrying a shield on his opposite arm (¶¶ 64-65).  He,

and unspecified others, gave commands to the residents of the house, directing

them to show their hands and get to the ground (¶ 66).  Upon entry, defendant

McGarvey saw one adult male retreat to a doorway further inside the residence

(¶ 67).  He did not know who this person was and could not estimate his age, but

he kept following him, and the individual kept disregarding his commands (¶¶ 68-

69).  Eventually defendant McGarvey got close enough to him to use his shield to

force this individual to the ground (¶ 70).  Another SERT member then secured

that person with flex cuffs, while defendant McGarvey worked elsewhere, with

other SERT members (¶¶ 71-72).  Defendant McGarvey has no recollection of

seeing the man he had pushed with his shield anywhere else, and is unaware of that

person suffering any injuries as a result of being forced to the ground (¶ 73).

---

[5] Paragraph 63 of defendants' district court factual summary does not include the word "not," but this appears to be a typographical error.  The underlying evidentiary document (SJ Ex. 21: Benson Callout Report, ECF No. 49-24) confirms that defendant Benson stayed with the non-compliant individual and did *not* interact with anyone else.

When defendant *Lance Schimp* entered the lower level of the house, he was armed with a rifle and a handgun (¶¶ 74-75).  He did not have any physical contact with any of the residents of the house (¶ 76).

By comparison, defendant *Clinton Painter* interacted more extensively with residents of the house.  Like defendant McGarvey, he entered the house with a hand gun in one hand and a shield on his opposite arm (¶¶ 37-38).  The shield had a viewing port and headlights on the front (¶ 38).  Defendant Painter, like other troopers, was giving commands to the residents to show their hands and get to the ground (¶ 39).  He held his shield over his face and looked through the viewing port, but was unable to see much because the indoor lighting was dim (¶ 40).

Initially, defendant Painter saw an adult male who retreated to a doorway further inside the residence.  He did not know who this person was (although he did not believe him to be Mark Anglemeyer, the resident of the property who allegedly had been involved in a number of controlled drug buys) (¶¶ 41-42).  Next, defendant Painter encountered a different adult male, who happened not to be wearing a shirt.  Surprised, and unaware of who this person was, defendant Painter pushed him to the ground (by applying his shield to the person's backside) (¶¶ 43-45).  Then defendant Painter went to the room where the first adult male was.  He was yelling and did not respond to commands to get to the ground.  Another trooper, also carrying a shield, pinned that person to the wall (¶¶ 46-48).

After that, defendant Painter moved further into the residence and encountered a female at or near a doorway. He did not know her name or age at that point, but later learned she was Ada Anglemeyer (¶¶ 49-50). Uncertain of who or what might be in the room behind her, he instructed her to show her hands and get to the ground (¶¶ 51-52). In fact, Ada had just been awakened by a noise and was standing outside her own bedroom (¶ 53). Having been asleep, she was not aware that the police were in the house, and she did not hear any commands by any officer(s) (¶ 54. *See also* ¶ 150).

Defendant Painter continued to approach Ada, who did not see him and – perhaps somewhat groggy because she had been asleep – she did not react to his presence (¶ 55). Evidently perceiving this as a lack of cooperation, defendant Painter then pushed Ada with his shield, which caused her to fall backwards (¶ 56). As a result, according to Ada, she broke a tooth and suffered other physical injuries (*See* ¶¶ 145, 149). SERT had brought medics to the operation, and they were promptly summoned to assess Ada's condition,[6] after which she was transported to a local hospital via ambulance (¶¶ 140-141).

---

[6] After the on-site assessment, another SERT member stayed with Ada while defendant Painter went into the room behind her and, later, participated in clearing the rest of the residence, including four additional rooms and an indoor pool area (¶¶ 57-59).

Meanwhile, defendant *Matthew Wysocky* was part of the team that gained access to the residence by entering through the upper level (¶ 92). He was the only defendant who did so.

Once in the house, defendant Wysocky entered a bedroom where he encountered an adult male and an adult female who, he later learned, were Joseph Kluska and his wife, Renae Kluska (¶¶ 93, 95). Joseph Kluska was in the bed, and there was a loaded handgun on the headboard (¶¶ 94, 96). He was asleep at the time, and was unaware that his relative, Mark Anglemeyer, was alleged to have sold methamphetamine from another building on the property (¶ 151).

Defendant Wysocky went toward Mr. Kluska, who was face down; pulled his arms behind his back; and handcuffed him, using flex cuffs (¶ 97). Defendant Wysocky then moved Mr. Kluska from the bed to the floor, in order to pat him down for weapons (¶ 98). The parties diverge on precisely how this was accomplished. Defendant Wysocky testified that he moved Mr. Kluska by grabbing him in the upper arm area, while Mr. Kluska testified that defendant Wysocky grabbed his wrist or the flex cuffs, picked him up, and dropped him onto the floor (¶¶ 99-100). In any event, no weapons were found on Mr. Kluska's person, so defendant Wysocky moved him from the floor to a nearby chair (¶¶ 101-102). Again, the parties diverge on precisely how this was accomplished. Defendant Wysocky testified that he helped Mr. Kluska to his feet and lead him to

the chair, while Mr. Kluska said that defendant Wysocky lifted him up by grabbing the flex cuffs that were still on his wrists (¶¶ 103-104).

According to Mr. Kluska, all this resulted in immediate pain in, and injury to, his shoulders, although he did not seek medical attention until several weeks later (¶¶ 105, 146. *See also* ¶ 151).[7] On the day at issue, he and his wife stayed where they were for about 15 minutes, after which they were escorted to a living room downstairs, where other residents of the house were then located (¶ 106).

In connection with the events at issue, plaintiffs themselves were not arrested or charged with any crimes. Mark Anglemeyer was arrested and charged (but ultimately was not convicted) (*See* ECF No. 51-11 – criminal docket).

**Procedural history.**

This litigation took a bit of time to "get off the ground." Initially, Ada, Richard, Jeffrey, and Mr. Kluska filed suit against Northampton County and certain county parties (plus two John Does) (*See* ECF Nos. 1-18).[8] Thereafter, they filed their "First Amended Complaint" (ECF No. 19). The Commonwealth and the

---

[7] Eventually, Mr. Kluska did have surgery for an injury to his right rotator cuff (¶ 146).

[8] Appellants' appendix includes a copy of the complete trial court docket (Appx. II, at 1-13). In this procedural summary (and elsewhere in this brief), district court docket events are cited by ECF number(s).

State Police itself were among the defendants named (for the first time) in that pleading.  After being served, the State Police moved to dismiss (ECF Nos. 25-25).  Rather than litigate that motion, the existing parties agreed that plaintiffs would file a further amended complaint (*See* ECF Nos. 31-32).

With that, the plaintiffs dropped all of their original claims, against all of the existing defendants (*See* ECF No. 32-1).  Instead, their Second Amended Complaint – against 19 individual State Police parties only – became the operative pleading (ECF No. 33).[9]

Following service of the Second Amended Complaint (*see* ECF No. 39), all 19 named State Police defendants answered (ECF No. 40).  Then, after discovery, those defendants filed a detailed motion for summary judgment, supported by multiple deposition transcripts and other materials (ECF No. 49).  The plaintiffs opposed the defense motion in part, resisting the summary judgment arguments being pressed by defendants Benson, Lopez, McGarvey, Painter, Schimp, and Wysocky (*See* ECF No. 51).  Plaintiffs added, however, that they "agree[d] all other Defendants should be dismissed from the matter" (*Id.*, at 1 n.1).  In other words, as defendants pointed out in reply, the plaintiffs "specifically agreed to the

---

[9] Previously filed motions to dismiss were denied as moot (ECF No. 34).

complete dismissal of 13 of the 19 defendants" (ECF No. 52, at 1), thus unquestionably narrowing the scope of this litigation.

The district court proceeded accordingly (*See* ECF No. 62, at 2). By memorandum and order entered September 13, 2022, the court granted summary judgment in favor of the six remaining State Police defendants in full (ECF Nos. 62-63). After recounting the background facts (ECF No. 62, at 2-3) and those applicable to each party's pending claim or defense (*id.*, at 4-9), the court turned to the law and explained why all six plaintiffs' excessive force claims "Fail[ed] Under the Facts and Circumstances Presented" (*id.*, at 11-19).

The plaintiffs then filed a timely notice of appeal (ECF No. 64).

**Rulings presented for review.**

Because the plaintiffs withdrew any claims they may originally have raised against 13 out of 19 named defendants (and because their appellate brief does not revisit an alleged conspiracy issue that was touched upon below), only one broad ruling is presented for review at this stage: the grant of summary judgment in favor of defendants Benson, Lopez, Painter, McGarvey, Schimp, and Wysocky on the plaintiffs' specific § 1983 excessive force claims against them. The district court found against plaintiffs, and for each defendant, on the merits and also concluded that the doctrine of qualified immunity applied. More specifically:

Defendant Painter was the only officer who had contact with Ada.  He acknowledged pushing her with his shield when she did not comply with his order to get to the ground.[10]  Under all the circumstances, the district court correctly found that this was not unreasonable.  The district court also correctly determined that, even though Ada was injured, that alone did not render the force used legally "excessive" (ECF No. 62, at 13-15).

Similarly, defendant Wysocky was the only officer who had contact with Mr. Kluska.  In context, the force used to restrain Mr. Kluska during the ongoing high-risk operation – in a house reportedly filled with weapons[11] and occupied by potentially violent individuals – was not unreasonable despite "[t]he fact that Mr. Kluska was injured in the incident" (ECF No. 62, at 16-17).

Jeffrey claims to have been subjected to excessive force by officers who physically tackled him and otherwise mistreated him during the raid, but the district court ruled against Jeffrey on two grounds, now ripe for review: Substantively, as the district court observed, the force used was not so objectively unreasonable, under all the circumstances, that it amounted to a Fourth

_____

[10] As noted, defendant Painter assumed that Ada heard his verbal order, but she may not have.

[11] In fact, a loaded gun was on Mr. Kluska's headboard when defendant Wysocky first encountered him.

Amendment violation.  In addition, Jeffrey's inability to identify which officer(s) harmed him prevented him from demonstrating which defendant(s) should be held accountable for allegedly violating his rights (ECF Nos. 62, at 17-18).

Finally, Richard attempted to press an excessive force claim against defendant Benson.  As the district court understood it, Richard claimed to have been hit by something hard, presumably a flashlight, and defendant Benson was one of two SERT members Richard encountered during the raid.  A problem that the district court recognized, however, was that Richard could not establish that it was defendant Benson – as opposed to the other officer he encountered (or anyone else on the scene) – who struck him.  Accordingly, the district court entered summary judgment in favor of defendant Benson as well (ECF No. 62, at 18-10).

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. There are no pending or completed cases to which it is related.

## SUMMARY OF ARGUMENT

The plaintiffs in this Fourth Amendment case cannot and do not challenge the facts of record regarding events at the property on the morning in question. But the plaintiffs close their eyes to the full legal implications of those details. Summary judgment for defendants was wholly justified.

This suit arises from a court-authorized premises search, not anyone's arrest. Plaintiffs lived on the premises and could be restrained during the search at issue. Crucially, the legal reasonableness of the search, as well as plaintiffs' seizures, had to be analyzed from the perspective of officers on the scene, rather than in hindsight. And this entails consideration of many case-specific details (such as the fact that residents of the property were known to possess multiple weapons; some had criminal records; and all were believed to be hostile to law enforcement).

Neither Jeffrey nor Richard could raise any triable Fourth Amendment issue on the merits. Contrary to *Jutrowski*, Jeffrey could not pinpoint who allegedly harmed him. Richard now focuses only on one defendant but that person's alleged misdeed (hitting Richard with a flashlight) would not be actionable, regardless.

And overall defendants were entitled to qualified immunity from plaintiffs' claims. Despite Ada's and Mr. Kluska's ensuing injuries, no clearly established law holds that residents of a 60-acre property being searched, who must be controlled amidst the chaos around them, cannot be touched by searching officers.

# ARGUMENT

*Standard of review:*

This Court exercises plenary review over an order granting a motion for summary judgment. *E.g., Karns v. Shanahan*, 879 F.3d 504, 512 (3d Cir. 2018); *Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 325 (3d Cir. 2015).

\*    \*    \*    \*    \*

The posture of this appeal is somewhat atypical.  In essence, all four plaintiffs maintain that the district court erroneously entered summary judgment against them on the merits of their respective Fourth Amendment excessive force claims, because – categorically – those claims simply had to be decided by a jury. *See* Appellants' Brief in Chief ("Brf."), at 2, 6, 23, 33, 34, 35, 36.  But that is wrong, as a matter of law.

As will be explained, plaintiffs' approach is substantively flawed for two broad reasons. Jeffrey and Richard did not set forth cognizable claims against the defendants at all (and therefore had no right to proceed to trial). *See* Section I, below.  Beyond that, the claims of all four plaintiffs were barred by qualified immunity. *See* Section II, below.

In passing, plaintiffs take note of the qualified immunity defense that may be available to governmental parties in civil rights cases, but they assert that the district court decided "only" that no constitutional violations occurred here.  Brf. at

21-22.[12]  So, according to plaintiffs, there is "no occasion" now for them to analyze the clearly-established-law "prong" of the legal framework that governs qualified immunity contentions.  Brf., at 22.

With this assertion, plaintiffs have effectively waived any right they might otherwise have to critique the district court's qualified immunity conclusions or respond to defendants' qualified immunity contentions at this stage.[13]  Nonetheless, the issue of qualified immunity was raised below (*see, e.g.,* ECF No. 49) and addressed by the district court, albeit tersely.   Regardless of plaintiffs' dismissive view, it will need to be considered at this juncture.

## I.     As A Matter Of Law, The Defendants Were Entitled To Summary Judgment On The Merits Of Jeffrey's and Richard's Fourth Amendment Claims.

To set the stage for defendants' response to Jeffrey's and Richard's substantive arguments – and their position on defendants' qualified immunity defense, as well, for that matter – certain background information, along with a summary of pertinent Fourth Amendment principles, is in order.

---

[12] This is inaccurate.  In its opinion, the district court recapped qualified immunity principles (ECF No. 62, at 11-12) and, as to three of the four plaintiffs, went on to find that the defendant(s) who interacted with them were entitled to qualified immunity (*Id.*, at 14, 16, 17).

[13] *See, e.g., Ghana v. Holland*, 226 F.3d 175, 180 (3d Cir. 2000); *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

**A.	The search of the property was planned in detail and carried out accordingly.**

The basic premise underlying this litigation appears to be that plaintiffs were law-abiding citizens, so the police had no right to barge into their residence in the wee hours of the morning and – warrant or no warrant – had no business restraining them physically during the ensuing search of the premises (causing, or at least risking, significant physical injuries).  Plaintiffs are incorrect on both counts.  From their perspective, the search of the property at 340 Old Allentown Road may well have been unexpected, inconvenient, and disruptive.  But that does not mean that, *ipso facto,* it contravened the Fourth Amendment.

In full, the Fourth Amendment to the Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.  Far from running afoul of this bedrock requirement, what the defendants did here, in cooperation with local police, was wholly consistent with it.

Crucially, a Common Pleas judge was satisfied that there was probable cause to search the premises, essentially from top to bottom, and duly issued a

warrant (*See* ECF No. 49-15). Plaintiffs cannot and (appropriately) do not suggest otherwise.

Beyond that, plaintiffs gloss over the fact that they could legally be restrained during the court-authorized search of the property. Importantly, although they were not the targets of that operation themselves, there is no question that they all resided on the premises to be searched. In such a situation, law enforcement officers executing a duly-issued search warrant (as the defendants were in this instance) may take "unquestioned command of the situation" by securing the premises and "detaining current occupants" for safety reasons. *Bailey v. United States*, 568 U.S. 186, 195 (2013) (discussing *Michigan v. Summers*, 452 U.S. 692, 702-703 (1981)). As this Court has recognized, "[t]his is reasonable to protect the police, to prevent flight, and generally to avoid dangerous confusion." *Baker v. Monroe Twp.,* 50 F.3d 1186, 1191 (3d Cir. 1995).

## B.      Governing Fourth Amendment principles are well-established.

In accordance with *Graham v. Connor*, 490 U.S. 386 (1989), "*all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" *Id.* at 395 (emphasis by the court). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful

balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 398 (internal quotation marks and citations omitted).

Defendants acknowledge that each plaintiff experienced a seizure. The substantive question, for Constitutional purposes, is whether the defendants acted reasonably under all the circumstances. As to Jeffrey and Richard, they clearly did (or, put differently, there is no basis in the extensive summary judgment record to conclude otherwise).

The reasonableness determination is both case-specific and objective. It hinges on whether the challenged actions of a defendant officer were reasonable in light of the particular facts and circumstances facing the officer, regardless of the officer's subjective intent or motivation. *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (citing *Graham*, 490 U.S. at 396-397).

*Rivas* goes on to explain that "[a]n excessive force claim must be evaluated 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight' and 'must embody the allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are often tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Id.*, 365 F.3d at 198 (*quoting Graham*, 490 U.S. at 396-397). This being so, the law "allows officers to draw on their own

experience and specialized training to make inferences from and deductions about the cumulative information available to them[.]" *See United States v. Arvizu*, 534 U.S. 266, 273 (2002).

In short, the governing standard contemplates "reasonableness at the moment." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Id.* (*quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

What is or is not "reasonable" is case-specific. Because the instant case arose in the context of the execution of a search warrant – as opposed to the apprehension of a criminal suspect – some of the *Graham/Rivas* benchmarks for analyzing reasonableness are not directly applicable.[14] Other observations in those decisions remain instructive, though. Thus, when assessing the reasonableness of a law enforcement officer's actions, it may be appropriate to factor in whether the persons subject to police action are themselves violent or dangerous, the possibility that those individuals are armed, and the number of people the police must contend with at one time. *See Rivas*, 365 F.3d at 198. These concerns are just as relevant

---

[14] For example, when dealing with a criminal suspect, the severity of the crime at issue, whether the suspect poses an immediate threat to the officer(s), and "whether he is resisting arrest or attempting to evade arrest by flight" must be considered. *Rivas*, 365 F.3d at 198 (*quoting Graham*, 490 U.S. at 396). These factors are less likely to affect the conduct of a premises search.

when (as here) law enforcement officers search occupied premises as they are when officers actively pursue, and seize, individual suspects.

### C. Neither Jeffrey nor Richard could show that he suffered a Fourth Amendment violation.

Based on the extensive agreed-to facts of this case,[15] the execution of the search warrant for the property did not infringe upon Jeffrey's or Richard's rights, as a matter of Fourth Amendment law.  In no way have they raised a triable issue to the contrary.

Obviously Jeffrey and Richard were in the house where they and other family members lived, when the warrant was executed, but that itself certainly does not justify a ruling allowing either of them to proceed to trial on any purported Fourth Amendment issue.  Each claims to have had a physical interaction with one or more defendants but as a matter of law, neither could

---

[15] Recall that Mark Anglemeyer, who already had a criminal record, was suspected of engaging in illegal drug activity at the location to be searched.  He lived on the property, which is large, with multiple relatives, some of whom also had criminal records, and all of them were considered hostile to "law enforcement."  Their sprawling house had multiple entrances and numerous rooms, on two levels.  Who might be where, and with whom, when the police arrived, was unknown and unknowable.  As a group, the residents were known to possess numerous weapons, which – it was assumed – they might readily use at the slightest provocation.  Put bluntly, the many state and local law enforcement officers involved in the operation at issue had undertaken a dicey mission.  Because executing the court-issued warrant was bound to be tense and risky, they had to proceed accordingly.

survive summary judgment, as the district court understood (*See* ECF No. 62, at 17-19).

First, the claims of both of these plaintiffs falter in light of this Court's decision in *Jutrowski v. Township of Riverdale*, 904 F.3d 280 (3d Cir. 2018), as the district court noted (*See* ECF No. 62, at 18, 19). *Jutrowski* confirmed, in the Fourth Amendment context, that liability under 42 U.S.C. § 1983 is individualized; the alleged acts of multiple potential defendants cannot be lumped together to enable a plaintiff to survive summary judgment. *Id. See also Williams v. City of York*, 967 F.3d 252 (3d Cir. 2020) (following *Jutrowski*).

By concentrating on three possible wrongdoers (*see* Brf., at 32-35), Jeffrey unquestionably attempted to do what *Jutrowski* prohibits. As a matter of law, that was not enough to raise an issue for trial.

Richard, on the other hand, tried to zero in on one defendant (Benson) but that was not a viable approach, because other officers were also in the vicinity when he allegedly was hit by a flashlight. Even assuming that defendant Benson is the specific person who hit Richard at some point, as plaintiffs now argue, *see* Brf. at 35-36, that alone is insufficient to forestall summary judgment. In context, and measured against the demanding legal standards articulated in *Graham* and its progeny, being hit by a flashlight in the midst of a complicated and somewhat

chaotic judicially-authorized, multi-officer operation would not, in and of itself, rise to the level of a Fourth Amendment violation in any event.

In sum, and consistent with the principles articulated in *Graham* and *Rivas,* whatever force may have been utilized to restrain Jeffrey and Richard cannot be deemed unreasonable under the specific, high-risk, fast-unfolding circumstances the defendants confronted. The district court specifically said as much in connection with Jeffrey's claim that an unspecified officer (out of three) allegedly mistreated him (ECF No. 62, at 17). A comparable conclusion is warranted with respect to Richard's claim (to have been hit with a flashlight). Hence, with regard to these two plaintiffs, no triable issue remains, as the district court understood. The defendants were entitled to judgment in their favor on the merits, as a matter of law, as the district court properly decided.

## II.     The Defendants Were Entitled To Qualified Immunity On All Of The Plaintiffs' Fourth Amendment Claims Against Them.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (*per curiam*) (quoting *Reichele v. Howards*, 566 U.S. 658, 664 (2012)). This defense is "tilted in favor of shielding government actors[.]" *Rivera v. Monko*, 37 F.4th 909, 914 (3d Cir. 2022). It affords ample room for

"mistaken judgments," *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)), protecting "all by the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Analyzing qualified immunity typically entails two distinct inquiries: The court must consider "whether the facts alleged by the plaintiff show the violation of a constitutional right" at all, and (if so) "whether the right was clearly established at the time of the alleged misconduct." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 176 (3d Cir. 2015).

If, as explained in Part I above, the defendants did not violate Jeffrey's or Richard's Fourth Amendment rights at all, the qualified immunity inquiry need go no further with respect to them. *See, e.g., Saucier v. Katz*, 533 U.S. 194, 201 (2001). They are entitled to summary judgment in any event.

As for Ada and Mr. Kluska, to the extent that further analysis is required, the end result is the same. As discussed, during the search of the property, Ada fell when defendant Painter pushed her with his shield, and she suffered physical injuries, requiring medical treatment, as a result. Mr. Kluska claims to have been injured when defendant Wysocky moved him from his bed to the floor, and then to a chair (while in flex-cuffs), although he did not seek or receive medical treatment until weeks later.

It does not follow that those developments amounted to violations of Ada's and Mr. Kluska's Fourth Amendment rights by defendant Painter and defendant Wysocky, respectively. Nevertheless, assuming, *arguendo*, that these actions violated, or at least might have violated, the Fourth Amendment, defendant Painter and defendant Wysocky were, at a minimum, entitled to qualified immunity from Ada's and Mr. Kluska's excessive force claims against them. Summary judgment in their favor was therefore correct as a matter of law.

This Court and the Supreme Court have explained how a person's qualified immunity defense is to be analyzed. Specifically:

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. ... [T]here must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put the defendant on notice that his or her conduct is constitutionally prohibited.

*Mammaro v. New Jersey Division of Child Protection and Permanency,* 814 F.3d 164, 169 (3d Cir. 2016) (internal quotation marks, brackets, and citations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (*per curiam*) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

The right at issue is not to be described at a high level of generality. *al-Kidd*, 563 U.S. at 742 (2011). Rather, it is to be defined in light of the specific context of the case at hand. *Saucier*, 533 U.S. at 200-201. So, for example, the

general proposition "that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  *Al-Kidd*, 563 U.S. at 742.

The constitutional "right at stake" in this case might be described as the right of all occupants of a residence on a 60-acre parcel of land, being searched by numerous law enforcement officers pursuant to a duly issued search warrant, to avoid any direct interaction with any officers, or possible physical injury, during a complex, court-authorized search for evidence of criminal activity.  To defendants' knowledge, and given *Graham v. Connor* and its progeny, there is no such right, let alone a clearly established right that may have been abridged in this instance.

Executing search warrants is dangerous and difficult.  *See Maryland v. Garrison*, 480 U.S. 79, 87 (1987).  Occupants of the premises to be searched may be detained during the search, *see Michigan v. Summers*, 452 U.S. 692 (1981), as occurred here.  Whether specific events during such a search contravene the Fourth Amendment must be analyzed in accordance with *Graham*'s capacious reasonableness standard, which is context-specific.  The use of force is not categorically proscribed.  For defendant Painter and defendant Wysocky to assert physical control over Ada and Mr. Kluska, respectively, was constitutionally permissible under all the circumstances and not contrary to clearly established federal law, despite any possible physical injuries that may have ensued.

33

# CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the

district court.

Respectfully submitted,

MICHELLE A. HENRY
Attorney General

By: */s/ Claudia M. Tesoro*

CLAUDIA M. TESORO
Senior Deputy Attorney General
Bar No. 32813 (Pa.)

J. BART DeLONE
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
1600 Arch Street
Suite 300
Philadelphia, PA 19103
Phone: (215) 560-2908
FAX:   (717) 772-4526

DATE:  March 27, 2023

## CERTIFICATE OF COUNSEL

I, Claudia M. Tesoro, Senior Deputy Attorney General, hereby certify as follows:

1.  I am a member of the bar of this Court.

2.  The text of the electronic version of this brief is identical to the text of the paper copies.

3.  A virus detection program was run on the file and no virus was detected.

4.  This brief contains 7,389 words within the meaning of Fed.R.App.P. 32(a)(7)(B).  In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

*/s/ Claudia M. Tesoro*

CLAUDIA M. TESORO
Senior Deputy Attorney General

# CERTIFICATE OF SERVICE

I, Claudia M. Tesoro, Senior Deputy Attorney General, hereby certify that I have this day served the foregoing Brief For Appellees electronically, via CM/ECF, on counsel of record for all appellants.

I further certify that seven (7) hard copies of this brief are being sent to the Clerk of the United States Court of Appeals for the Third Circuit, in Philadelphia, Pennsylvania, as required under the Court's procedures.

*/s/ Claudia M. Tesoro*

CLAUDIA M. TESORO
Senior Deputy Attorney General

DATE: March 27, 2023